## GUARDIAN SECURITIES CORPORATION v. MAHONEY et al.

### No. 9629.

Court of Civil Appeals of Texas. Galveston.

Feb. 26, 1932.

Rehearing Denied April 21, 1932.

964

, D. A. Frank and Edward Gregg Wallace, both of Dallas, for appellant.

Harry Dow and Daniel Schlanger, both of Houston, for appellees.

PLEASANTS, J.

This suit was instituted by appellant as attorney in fact for Bankers Lloyds, insurers, to set aside an award by the State Industrial Accident Board in favor of appellees against the Bankers Lloyds. In answer to the suit the appellees Michael Mahoney and his attorney Harry Dow by cross-action sought to recover against Bankers Lloyds upon a workman's compensation policy issued by said insurer to the Hubbard Construction Company, the employer of appellee Mahoney, for an injury sustained by Mahoney in the course of his employment. The amount claimed under the policy is $20 per week for 401 consecutive weeks from January 10, 1929, with 6 per cent. on all past-due weekly installments. The defendants' pleading further asked for a lump-sum settlement of the amount found to be due under the policy.

Appellant answered this pleading by general demurrer, special exception, and general denial. On the trial in the court below the fact issues raised by the evidence were specially submitted to a jury, and upon return of the verdict upon the issues submitted judgment was rendered in favor of appellees for the lump sum of $6,536.76.

Appellees' pleadings, after alleging as before set out the issuance by appellant of its workman's compensation policy of insurance to appellee's employer, the T. B. Hubbard Construction Company, and appellee's injury sustained in the course of his employment, thus alleges the circumstances under which he received the injuries complained of and their character and extent:

"8. That on the 10th day of January, 1929, and while engaged in the course of his employment with the said T. B. Hubbard Construction Company in the City of Houston in Harris County, Texas, the said Michael Mahoney sustained certain personal injuries in the manner and to the extent hereinafter set out: That while working as a carpenter on what is now known as the Krupp & Tuffly Building located at the intersection of Main Street and Walker Ave. in Houston, Texas, and that while working on an elevated scaffold on the third floor of said structure, he fell off of said scaffold through an opening on the third floor left to build stairs, but which was uncovered, landing on the second floor of said structure, said second floor being of solid concrete; that he landed on his head and shoulder and was rendered unconscious for about two and one-half hours; that he suffered by virtue of said fall, a concussion and contusion of the brain, generalized contusions and abrasions, both arms and legs; that his skull was fractured over the rolandic area; that he sustained an extensive scalp laceration over the cranium, part of which is visible over his forehead; that he fractured his right first rib, and contusion of overlying soft parts; that four of his teeth were shattered; that he also sustained a severe contusion of the right upper arm and right shoulder, causing an involvement of the brachial plexuses and a general disturbance to his nervous system.

"9. That said Cross-Petitioner, Mahoney, alleges that as a result of said injury and accident he is permanently, totally incapacitated and disabled; that his head is fractured and disfigured; that by reason of said fracture there is a pressure on the brain; that he is subject to continuous and repeated attacks of vertigo, or dizziness which will last indefinitely; that the injury to his brain has resulted in motor paralysis of both arms, but more particularly his right arm and hand, and his legs and feet; that he has a stiffness and a numb feeling in both hands and fingers more especially a dull feeling of numbness in the fingers of his right hand, thus rendering it impossible for him to have a proper grip of carpenters tools, and causing him great pain and physical suffering weakening his entire body and causing an incurable shock to his whole physical and nervous system, so that he suffers continually not only from the said injury, but also from headaches, vertigo, dizziness, nervousness, traumatic neurosis and general debility; that he has followed the trade of carpentry for many years and has been employed in the construction of high structures; that his attacks of vertigo causing him a loss of senses and a dizziness in his head which causes all objects to become black to his sight, rendering it impossible for him to maintain his balance, and his suffering with traumatic neurosis; thus rendering it dangerous and impossible for him to practice his trade of carpentry in the erection of structures, and have left him in a permanently and totally disabled condition, having deterred him from earning a livelihood for himself at manual labor, and that he is not qualified by education, training or experience to earn money in any other vocation or calling, except that which has to do with manual labor."

He alleges that within less than thirty days after the before-described accident and injury to him he gave notice thereof to his employer, T. B. Hubbard Construction Company, and made claim for compensation therefor to his employer and to appellant, and further alleges: "In the alternative, Cross-Petitioner, further alleges that if he be mistaken in the allegations of his next preceding paragraph,

or any of them, then that cross-defendant waived a strict compliance by Cross-Petitioners with the law with respect to his giving notice and filing his claim for compensation by recognizing Cross-Petitioner's said claim rendering him medical care and attention, hospital service, etc., and by paying him compensation at the rate of $20.00 a week for a period of seventeen weeks; that such conduct on the part of Cross-Defendant, its agents and servants constitutes a waiver by Cross-Defendant of all requirements of law with regard to this petitioner's giving notice of his said injury and making claim for compensation in respect thereto to the Industrial Accident Board, and Cross-Petitioner further says that by reason of such conduct in the matter and these premises, Cross-Defendant is estopped to deny that notice was given by Cross-Petitioner of his said injury and that claim was made by him with respect thereto to the Industrial Accident Board in the form and manner required by law."

The issues submitted to and answers by the jury were as follows:

"Special Issue No. 1. Did the injury which the defendant Michael Mahoney received on January 10, 1929, result in permanent incapacity or temporary incapacity as those terms have been hereinbefore defined to you? Answer 'Permanent' or 'Temporary,' as you find the facts to be. (To this issue the jury answered: Permanent.)

"Special Issue No. 2. If you have answered the foregoing Special Issue No. 1 'Permanent,' and only in that event, then answer this special issue: Do you find such incapacity resulting from Michael Mahoney's injury to be total or partial? Answer 'Total,' or 'Partial,' as you find the facts to be. (To this issue the jury answered: Total.) If you have answered No. 1 'Permanent,' and No. 2 'Total,' then you need not answer any further issues submitted to you, except Special Issue No. 3.

"Special Issue No. 3. Would manifest hardship and injustice result to the defendant Michael Mahoney if compensation, if any, be paid to him otherwise than in a lump sum? Answer 'It will,' or 'It will not,' as you find the facts to be. (To this issue the jury answered: It will.)"

As will be hereinafter shown, there was sufficient evidence to sustain a verdict in appellees' favor; but upon the issue of the character, extent, and duration of the injuries sustained by the plaintiff Mahoney the evidence was sharply conflicting.

▮ Before proceeding to consider the questions presented in appellant's brief, we will dispose of appellees' independent proposition, which is the first proposition in their brief, and is as follows: "Appellees' First Independent Proposition. Where appellant filed a supersedeas bond and appellee moved to dismiss the appeal because said bond was defective, and the court issued its order dismissing the appeal unless a corrected bond was filed within fifteen days, and appellant, after filing motion for rehearing which was overruled, filed an appeal bond, the appellate court should either dismiss the appeal on the ground that the filing of said bond is not in compliance with the provisions of article 1840, or the appellate court should hold that upon affirmance of the case, judgment will be entered against the surety on the original supersedeas bond in accordance with the provisions of Articles 2272, 2273, and, particularly Article 2274."

This proposition is based upon the following facts presented in appellees' brief:

"The original appeal bond filed in this case purported to be a supersedeas bond.

"Appellee filed a motion to strike the bond, because of its defects, and this court sustained the motion and gave the appellant fifteen days within which to file an amended bond. The appellant filed a motion for rehearing on the court's order dismissing the appeal unless a statutory bond be filed within fifteen days, and said appellant's motion for rehearing was by the court overruled. Thereupon appellant filed an appeal cost bond on May 21, 1931, or some seven months after the plaintiff's motion for new trial was overruled in the trial court.

"The appellees, thereupon, filed their motion to strike said bond because same was not an amended supersedeas bond, but was merely an appeal cost bond, and the filing of such bond was not sanctioned by statute; or in the alternative, that if the said bond should be accepted by this Honorable Court, that this court hold that if the judgment of the trial court be affirmed, judgment will be entered against the surety on said supersedeas bond by virtue of the provisions of articles 2272, 2273, and particularly, article 2274."

We cannot sustain this proposition. The original bond which sought to supersede the judgment appealed was defective and on motion of appellees this court so declared, and required appellant to file a new bond in compliance with the statute. Appellant complied with this order by filing a cost bond containing all of the statutory requirements. When this bond was filed, appellees filed a motion to dismiss this appeal upon the grounds stated in their above set out independent proposition. This motion was taken and considered with the case and must in our opinion be refused. We cannot agree with appellees that in the situation shown by the record and before stated, appellant was required to file a new supersedeas bond in order to continue to prosecute its appeal, and no authority is cited that sustains such contention. In the cited case of Dillard v. First National Bank of Canyon (Tex. Civ. App.) 143 S. W. 682, 683,

Judge Graham makes the following statement: "There is an element of justice in appellee's contention that appellant should not at this late date be allowed to have the case passed on in this court on its merits by merely filing in this court an appeal cost bond and not a supersedeas appeal bond, after having delayed appellee in the issuance of an execution on its judgment as a result of having filed the bonds held void, but as the time allowed by this court in its former opinion within which a bond could be filed by appellant and approved in this court has elapsed, and no bond of any character has been filed in this court by appellant, no injury has been done appellee or can now result to appellee because of the matter complained of."

There may have been an element of justice in that case in favor of the appellee as said by the able justice in his opinion, but the case was not dismissed on that account as shown by the opinion. So, too, there may be an element of justice in appellee's contention that they should not have been delayed in the enforcement of their judgment by appellant's failure to file a sufficient supersedeas bond. But the bond filed was sufficient to give this court jurisdiction of the appeal and there is an element of equal justice in favor of an appellant's right to have an erroneous judgment against him reversed by only giving the necessary cost bond required by the statute. This would be specially true if the case was one in which the appellant was required upon motion of appellee to give a new bond, and was unable to obtain other than a cost bond.

For the reasons hereinafter stated, we have reached the conclusion that the judgment of the trial court should be reversed and the cause remanded for a new trial, and therefore it becomes unnecessary for us to decide the question of whether, in event we had affirmed the judgment, we could hold the sureties on the defective supersedeas bond liable for such judgment.

While the uncontradicted evidence shows that appellee Mahoney fell from a ladder while engaged in the performance of the duties of his employment and struck on his head on one of the concrete floors of the building some fifteen or more feet below the place from which he fell, and received a serious injury, resulting in concussion of the brain from which he was rendered unconscious and remained in that condition for some time after the accident, his condition after he left the hospital and at the time of the trial was an issue upon which the evidence was sharply conflicting. One doctor testified for appellee that Mahoney's fall fractured his skull and was the cause of his continued incapacity to work. On the contrary, witnesses for appellant who had examined him testified in substance that Mahoney had no fracture of the skull, recovered from the concussion caused by his fall before he left the hospital, and that his continued incapacity was due to arthritis caused by uric acid, rotten teeth and tonsils. Dr. Gates, who treated him while he was in the hospital, testified:

"After this man got out of the hospital he came back for treatment until the 9th of April. 'My official treatment was discontinued on the 9th of April, because I regarded him as of in no further need of treatment. I had examined him carefully. I found nothing at all wrong with him in connection with the injury to keep him from going to work. I think the old arthritis that he had would interfere a good deal with his work.'

"The doctor examined him at a later time with other doctors. 'In none of the examinations after March, 1929, did I find anything wrong with him that could have been produced by the accident he had, which would prevent his starting to work. In so far as any result of the accident is concerned, I think he is able to go to work.'

"The doctor described the findings of a subsequent examination in his clinic on March 19, 1930, over a year after the man's discharge from the hospital.

"He made a special examination to see if the man had any injury to the cells on the left hand side of the brain and found none. 'He had no symptoms during the time he was in the hospital under my observation nor at any time that I examined him that indicated any permanent injury to his brain.'

" 'I have noticed this trembling that he does with his hand or with his head. That is caused by intentional trembling; it is something that can be stopped by effort or will power. * * * If a man kept it up, the trembling could become habitual. I think that the advance of age has something to do with tremor; lots and lots of senile tremors are found. * * * I do not think there was anything that I saw there in this tremor connected with his injury.'

"As to the ataxic test, the doctor testified that the result showed that the man had an 'intentional ataxia,' which he could stop if he wanted to.

"The pendency of the lawsuit, the drinking of liquor for many years and old age, all had their effects upon the body. The man had two arms, two legs, two eyes, two ears, a back bone, a stomach, a head, a neck and no part of his body was missing. He had been inactive for a year and if he should start taking exercise he should start gradually and the muscle tone would return or improve upon exercise."

Appellee Mahoney testified on cross-examination: "I have drunk some, a little, but I have not been a drinking man all my life. I had not started to drink anything until I was twenty-two years old. I then started drinking moderately. By that I mean that I would take a drink when I wanted a glass of beer;

I went in and got it and got through with it. I started drinking whiskey about the same time. I would take probably two or three drinks of whiskey a day, possibly; I don't know, I never kept account of that. I would probably take four or five or six drinks of beer a day, I don't know. I did not keep that up practically all my life until I came to Houston. I let up on it when prohibition came in. That was about three years before I came to Houston. I kept up my drinking until prohibition came into effect. I never increased it at all before prohibition; if I felt as though I wanted a drink, I had it. I did not go in and swish it, as you are trying to make up. Who told you that about 1905 and 1906, and up until 1915 and 1916, I was drinking more whiskey and more beer than I was in 1895? I am telling you that I did not. I drank only moderately. I was never drunk in my life. I suppose the most I ever drank in my life in one day was about three drinks of whiskey and possibly half a dozen drinks of beer. That is about the most I remember ever drinking at any time; I never kept track of it."

 In this state of the evidence one of the attorneys for appellees in his address to the jury made the following arguments: "And isn't it strange, gentlemen of the jury, that he tried to make a drunkard out of the man, but it doesn't sound strange to me, when I know that Michael Mahoney suffered that injury. Oh, you can't get away from it. It only comes back to the fact that when you have an injury, the insurance company and their representative will always try to find something in the man that is different from the injury that he suffered. * * * Whose testimony do you want to take? Do you want to take the testimony of a disinterested doctor, a doctor who is not hired by one side or the other, and who tells you, as I have told you, that he was unable to go to work, and never would be, or do you want to take a doctor's who is hired by the insurance company, who is so inconsistent that it is just obvious?"

Each of these statements to the jury were improper and calculated to improperly influence the jury in finding their verdict upon the issue of the cause of Mahoney's condition after he left the hospital and at the time of the trial. Appellant objected to each of these statements of the attorney at the time it was made on the grounds that it was an unsworn statement of facts outside the record and prejudicial to appellant. These objections were overruled, to which ruling appellant excepted and has preserved its objections by proper bills of exception. The impropriety of these statements of the attorney cannot be doubted, and upon the state of the evidence disclosed by the record this court cannot say they were harmless. The established rule in our juris-

prudence on the subject of improper arguments to a jury is thus stated in 3 Texas Jurisprudence, § 883: "With reference to improper remarks or argument of counsel, the rule appears to be settled that judgment will be reversed and the cause remanded unless it affirmatively appears from the record that the improper argument was harmless." Blohm v. Krueger (Tex. Civ. App.) 297 S. W. 596; Ry. v. Thomason, 3 S.W.(2d) 106.

This conclusion requires a reversal of the judgment, and it has been so ordered.

It would serve no useful purpose to discuss the remaining propositions presented in appellant's brief. If error is shown in any of them, it is not such as is deemed material, or likely to occur upon another trial.

Reversed and remanded.